UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-20173-CR-MORENO

UNITED STATES OF AMERICA,

vs.

ELEMETAL, LLC,
    d/b/a "Elemetal,"
    d/b/a "NTR Metals,"

    Defendant.
_____/

## FACTUAL PROFFER

The United States of America and ELEMETAL, LLC, d/b/a "Elemetal," d/b/a "NTR" ("ELEMETAL") stipulate that if this matter were to proceed to trial, the Government would prove the stated facts beyond a reasonable doubt:

ELEMETAL

1. From August 2012 through November 2016, ELEMETAL was a dealer in precious metals and a financial institution, as defined in Title 31, United States Code, Section 5312(a)(2)(N) and Title 31, Code of Federal Regulations, Section 1027.100, operating in the Southern District of Florida and elsewhere.

2. More specifically, ELEMETAL operated a precious metals refinery, which bought unrefined precious metals, such as mined gold, refined it, and sold it for profit.

3. From August 2012 through November 2016, ELEMETAL, by and through its agents, purchased billions of dollars of gold from countries around the world, including from Central America, South America, the Caribbean, and Europe, and maintained offices and operations in some of these locations.

## AML REQUIREMENTS FOR PRECIOUS METALS DEALERS

4. At all relevant times, the international gold trade was a common and well-known method for the laundering of illegally mined gold, narcotics and other criminal proceeds. Criminals frequently trade illegal gold through illicit shell or front companies using false or incomplete documents. The gold is often smuggled through third-party countries and then sold to refineries in the United States, in an effort to hide the true source, ownership, and origin of gold from foreign and United States law enforcement.

5. Recognizing the high risk of gold-based money laundering, federal law requires precious metals dealers to establish anti-money laundering (AML) programs, under Title 31 United States Code, Section 5318(h) and Title 31, Code of Federal Regulations, Section 1027.210.

6. More specifically, precious metals dealers are required to "develop and implement a written anti-money laundering program reasonably designed to prevent the dealer from being used to facilitate money laundering and the financing of terrorist activities through the purchase and sale of [precious metals]" with certain minimum requirements as set forth in Title 31, Code of Federal Regulations, Section 1027.210.

7. At all relevant times, ELEMETAL was subject to these AML obligations under the law, and ELEMETAL was aware of its legal obligations under Title 31, United States Code, Section 5318(h) and Title 31, Code of Federal Regulations, Section 1027.210.

8. Notwithstanding its known legal duty, from August 2012 through November 2016, ELEMETAL violated Title 31, United States Code, Section 5318(h) and Title 31, Code of Federal Regulations, Section 1027.210 by willfully failing to develop, implement, and maintain a reasonably designed AML program as required, in further violation of Title 31, United States Code, Section 5322.

## ELEMETAL's AML VIOLATIONS

9. Although ELEMETAL, by and through its agents, did maintain a written AML policy with a specific compliance program and a designated compliance officer, during the relevant time period, it willfully failed to develop, implement, and maintain an AML program reasonably designed to prevent ELEMETAL from being used to facilitate money laundering and the financing of terrorist activities as follows.

10. <u>First</u>, ELEMETAL, by and through its agents, accepted gold from persons and entities without requesting or obtaining adequate, or in some instances any, identification and information regarding those persons or the source of their gold, including from: (1) Third-parties in foreign countries directly providing gold to the defendant on consignment to the defendant's approved customers; (2) Third-parties in foreign countries who the defendant knew to be supplying gold to the defendant's approved domestic customers; and (4) Third-parties in foreign countries who appeared as the manufacturer or shipper of the gold on U.S. customs declarations. By way of example:

    a. ELEMETAL, by and through its agents, received approximately $114 million in gold directly from approximately 43 different, non-customer entities or persons in Peru, on "consignment" to third-party ELEMETAL customers; ELEMETAL neither requested nor obtained any information regarding the identity of the individuals providing this gold or the source of the gold.

    b. ELEMETAL, by and through its agents, received approximately $400 million in gold directly from approximately 6 different, non-customer entities in Ecuador, on "consignment" to a third-party, domestic ELEMETAL customer; ELEMETAL neither requested nor obtained any information regarding the identity of the individuals providing this gold or the source of the gold.

3

    c.    ELEMETAL operated, by and through its agents, in the UK from which it purchased gold and other precious metals from 111 customers without any AML compliance vetting; ELEMETAL knowingly allowed this practice to continue for over a year after one ELEMETAL AML compliance offer listed the failure as a reason for his resignation to ELEMETAL executives.

11.    <u>Second</u>, ELEMETAL, by and through its agents, accepted gold from foreign gold suppliers who represented themselves to be "gold collectors," a vague business that involves nothing more specific than someone who buys gold from others without requesting or obtaining adequate (or in some instances any) further information as to the source and origin of gold. By way of example:

    a.    In 2012 and 2013, ELEMETAL, by and through its agents, purchased approximately $350 million dollars of gold from four companies in Peru, but obtained only the following information, contained in internal emails as to the source of gold from each company, respectively:

        i.    "They are collectors and anticipate 50Kgs per week in Dore bar form 90% and higher,"

        ii.    "[T]hese individuals are artisanal miners and source their own minerals as well as buy from other miners,"

        iii.    "They are a collector and expected volume is 100 kgs per week," and

        iv.    (No information).

These companies were in fact front companies sourcing illegally mined gold, engaging in foreign bribery, and associated with a well-known narcotics money launderer.

4

b.  In 2014 and 2015, ELEMETAL, by and through its agents, purchased approximately $250 million in gold from a company in Bolivia with no information as to the source of gold save for an internal email stating that the company "is a family based business with pooled family capital and ... has a capacity for about 70 kilos a week. They are not a refiner." After months of highly suspicious volumes totaling over $100 million of gold, ELEMETAL decided to "dive deeper" into the company and obtained a report which concluded only that more information was needed as to the source of the gold, but ELEMETAL, by and through its agents, continued to purchase millions of dollars of gold from the company without obtaining additional information. This company was in fact selling smuggled gold from Peru.

12.  Third, ELEMETAL, by and through its agents, accepted gold from countries and customers where the defendant's country-by-country and customer-by-customer sales volume records indicated that gold was likely being smuggled across borders in response to law-enforcement crackdowns and that customers were using rotating front companies, without requesting or obtaining adequate, or in some instances any, follow-up information as to the source and origin of gold. By way of example:

a.  In 2013, ELEMETAL, by and through its agents, purchased almost $1 billion in gold from Peru, an epicenter of illegal gold mining and gold money laundering. This was a significant increase from the only $70 million ELEMETAL, by and through its agents, had purchased from Peru the year before, and was comprised mostly of highly suspicious customers with no clear source of gold, no gold sales histories and short bursts of soaring sales.

b. By the end of 2013, Peru seized millions of dollars' worth of gold from ELEMETAL based on the allegation that the gold was illegally mined, and cracked down on illegal gold shipments by instituting strict gold export requirements from Peru.

c. ELEMETAL was aware of these events in Peru and knew immediately after Peru's gold-export crack-down that gold would likely begin to be smuggled from Peru through Ecuador and Bolivia. In one internal email sent to ELEMETAL executives on January 14, 2014, ELEMETAL acknowledged "exports of [precious metals] from Lima has all but stopped. ... Our customers have advised that [precious metal] is transiting the border to Bolivia and Ecuador."

d. By February 2014, ELEMETAL's purchase records indicated that, ELEMETAL, by and through its agents, was likely purchasing smuggled gold from Ecuador and Bolivia. In one internal email sent on February 10, 2014, executives at Elemetal were made aware of substantial spikes in imports from several customers in Ecuador and Bolivia and the concern that this represented smuggled material. In another internal email between ELEMETAL executives on March 11, 2014, ELEMETAL acknowledged that the total U.S. import volumes from Ecuador that year "are up 92%" and that a single ELEMETAL customer, which had been a previous cause of smuggling concern, "represents the majority of the increase." In another internal email on July 2014, an ELEMETAL executive informed the ELEMETAL AML compliance officer that a single ELEMETAL customer in Bolivia "was on track/pace to deliver 500-600MM per year .... which exceeds total country imports from Bolivia to the U.S."

e. ELEMETAL's purchase records indicated that ELEMETAL, by and through its agents, was likely purchasing smuggled gold from Ecuador and Bolivia in 2014;

6

following Peru's illegal gold crackdown, ELEMETAL's purchases from Peru sank from $980 million in 2013 to $79 million in 2014, and its purchases from Ecuador and Bolivia grew by at least $485 million.

   f.   Nevertheless, ELEMETAL took no action to close, suspend, or reasonably determine the origin of gold for any of its Ecuador or Bolivia customers in 2014. According to the testimony of one ELEMETAL executive "this was an issue that really concerned [him] and something that [he] raised repeatedly" with other ELEMETAL executives, but which was never actually addressed. ELEMETAL, by and through its agents, was in fact purchasing smuggled and Peruvian gold from Ecuador and Bolivia.

13.   Fourth, ELEMETAL, by and through its agents, accepted gold from specific customers and suppliers where open-source and publicly available information indicated that those specific customers and suppliers were likely supplying criminally derived gold, without requesting or obtaining adequate, or in some instances any, follow-up information as to the source and origin of gold, and failed to request or obtain adequate, or in some instances any, follow-up information as to the source and origin of gold where open-source and publicly available information indicated that the ELEMETAL, by and through its agents, was likely sourcing criminally derived gold. By way of example:

   a.   On August 5, 2015, ELEMETAL was referenced in a widely available investigative report by way of its South American brand name, "NTR Metals," as being associated with the laundering of illegal gold from Peru through Bolivia. ELEMETAL made no effort to investigate the reporting and went on to purchase approximately $140 million in gold from two Bolivian suppliers also mentioned in the report. Both Bolivian suppliers were selling smuggled Peruvian gold.

14. <u>Fifth</u>, ELEMETAL failed to request or obtain adequate, or in some instances any, information regarding the content of communications between gold suppliers and the defendant occurring on encrypted, peer-to-peer chat services, such as WhatsApp or Skype.

15. In connection with ELEMETAL's AML failures, in violation of Title 31, United States Code, Section 5322, hundreds of millions if not billions of dollars of laundered gold entered the U.S. financial system, including gold which represented the proceeds of international narcotics trafficking, foreign bribery, foreign smuggling, illegal gold mining, and U.S. customs violations in violation of Title 18, United States Code, Section 1956 and 1957, and other foreign and domestic laws.

16. At least $15,000,000.00 in funds belonging to ELEMETAL was traceable to and involved in the money laundering activities described in Paragraph 15 and ELEMETAL's violation of Title 31, United States Code, Section 5322.

17. ELEMETAL cooperated with the United States in the investigation of this matter, as well as numerous other related investigations. In addition, ELEMETAL conducted its own internal investigation and provided evidence from that investigation to the United States.

**RANDY A. HUMMEL**
ATTORNEY FOR THE UNITED STATES,
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. § 515

Date: 3/16/18

By: _____
FRANCISCO R. MADERAL
ASSISTANT UNITED STATES ATTORNEY

Date: 3/

By: _____
CHRISTOPHER R.J. PACE
ATTORNEY FOR DEFENDANT

Date: 3/15/18

ELEMETAL, LLC
DEFENDANT

By: _____
STEVEN LOFTUS